**UNITED STATES of America,
Appellant,**

v.

**Antonio AYALA, a/k/a "Tony",
Defendant-Appellee.**

**UNITED STATES of America, Appellee,**

v.

**Juan GONZALEZ, a/k/a "Cartero",
Defendant-Appellant.**

**Docket Nos. 84–1364, 84–1391.**

United States Court of Appeals,
Second Circuit.

Argued March 25, 1985.

Decided Aug. 1, 1985.

Barry J. Teller, Kew Gardens, N.Y., for appellant Gonzalez.

Kerri L. Martin, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Stacey J. Moritz, Asst. U.S. Atty., New York City, of counsel), for appellee-appellant United States of America.

Melvin M. Lebetkin, Kew Gardens, N.Y., for appellee Antonio Ayala.

Before OAKES, MANSFIELD and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Juan Gonzalez appeals from his conviction for engaging in a continuing criminal enterprise, 21 U.S.C. § 848 (1982), and the government appeals from Judge Sweet's order setting aside a jury verdict convicting Ayala of the same crime. Both defendants entered guilty pleas to conspiracy to distribute, distribution, possession with intent to distribute, and the use of telephones to facilitate the distribution of heroin in violation of 21 U.S.C. §§ 846, 812, 841(a)(1), 841(b)(1)(A) and 843(b) (1982). We affirm.

## BACKGROUND

The government's evidence at trial consisted of the testimony of an informant and various Drug Enforcement Administration agents. In addition, the government introduced as exhibits sums of cash, heroin, drug paraphernalia, drug records, and ammunition seized from Gonzalez's car and apartment as well as tapes of telephone conversations. Because the jury convicted both Gonzalez and Ayala, we view the evidence in the light most favorable to the government. The only issue being the sufficiency of the evidence with regard to the § 848 convictions, we will relate that evidence in considerable detail.

### The Street Distribution Organization

The government's first link to this drug distribution organization, which was run out of a building at 390 East 8th Street in Manhattan, was through a 39-year old heroin addict named Jose Feliciano. He was recruited into the organization in 1983 by his friend Guillermo Rentas to watch over heroin supplies while Rentas made street sales of a brand of heroin called "Excellent." Gonzalez, Ayala, and a third party, Abraham Betancourt, supplied Rentas with his heroin. Rentas was a salaried "street distributor," or one who distributes drugs in part through "street runners," who in turn sell bags of heroin to passing automobiles for a small commission plus drugs. Rentas received $500/week base pay plus a commission of $1 per bag. Salaried street distributors who were addicts also received two bags of heroin each morning.

During the period in 1983 when Rentas and Feliciano worked together, they made daily sales ranging from $5000 to $6000, Rentas paying Feliciano $150–200 a week plus drugs. According to Feliciano, some six to eight other salaried street distributors were on the organization's payroll and they, in turn, supervised some 15–25 runners who sold drugs to passing automobiles on Avenue D and 8th Street.

Feliciano was offered a salaried job by Gonzalez and Betancourt, but before he could accept, he was arrested. After his release, Gonzalez and Betancourt hired him as a lookout for the "Excellent" sales organization.

By now, however, Feliciano was cooperating with the government as an informant. He testified that Betancourt told him that Gonzalez was the boss of the "Excellent" brand, and Feliciano regularly observed Gonzalez carrying away the cash proceeds of the organization. Feliciano

also overheard Gonzalez discuss various territorial and temporal restraints on "Excellent" sales negotiated with a rival heroin dealer. He learned that the 15–25 street runners received a commission of $2 per bag and a bag of heroin for every ten they sold. Gonzalez, Ayala, or Betancourt chalked the daily roster of runners on the walls of the lobby of the 8th Street building. When some of the addict-workers complained to Gonzalez that Betancourt was not giving them their quota of drugs for personal use, Gonzalez replaced Betancourt with Ayala for about two weeks. Feliciano further testified that "Excellent" was a strong seller; he observed Betancourt and Ayala sell as many as 1000–2000 bags exclusive of loose powder and smaller weight units. "Excellent" was also sold at a second location at 3rd Street and Avenue D.

### The Bulk Sales

Elida Wodicka, an undercover New York City police officer assigned to the Drug Enforcement Task Force, was introduced by Feliciano to Rentas and Betancourt on January 18, 1984. As she entered the 8th Street distribution building that day, she observed about 10 car-sale runners outside the building and another 15–20 walk-in customers in the building. She ordered 50 bags, received 51, and paid Rentas and Betancourt $500.

On January 30, she returned to the 8th Street building and discussed an additional purchase with Ayala. At that time, surveillance officers observed Ayala and a young girl make what appeared to be drug sales to persons on the street. On February 7, Wodicka met with Gonzalez and Ayala who agreed to sell her an additional $500 of "Excellent." Wodicka testified that when Gonzalez made the sale to her, he remarked, "I don't usually do this. I don't sell directly to anyone. I have other people that do the selling for me ... Abraham Betancourt takes care of 8th Street. You know, he is the manager down there." Gonzalez advised Wodicka that the lower east side was very "hot" (i.e., police were making arrests) and gave her his paging beeper number.

On February 13, Wodicka placed a call to the beeper, which Ayala later returned, and arranged for another sale in Brooklyn. Wodicka was met there by a young girl who said "Tony sent her." When Wodicka refused to buy from the girl, she then returned in a car with Ayala who stated that he had to stay with the stash of heroin in the car and that the girl could be trusted. Wodicka purchased ten bulk bags of "Excellent" heroin from the girl for $800.

Wodicka subsequently called the beeper and on March 1, Gonzalez and Ayala arranged for a fourth sale to her in Brooklyn. Wodicka observed that Ayala was wearing what appeared to be a full-length black mink coat. She offered to buy whatever heroin stock they had on hand, and they sold her $450 of "Excellent" heroin bags. Wodicka informed them that she was expanding her business and adding a partner; Gonzalez advised her not to, stating that he had experienced a lot of "headaches" when he expanded his business and that a lot of workers created increased problems.

After this fourth sale, Wodicka made several calls to the beeper but was unsuccessful in arranging a meeting. On one call, Ayala informed her that Gonzalez was away in Puerto Rico and that "his people" wanted to know where and to whom she was selling. She refused to give him this information. Nevertheless, he arranged for another sale in Brooklyn. When Wodicka stated that she trusted only Gonzalez, Ayala responded, "We're brothers." The following week, Ayala sold Wodicka $3000 of loose brown heroin.

On April 17, Gonzalez and Ayala were arrested. The trunk of the car they were in contained $2000 in cash. Gonzalez had one gram of heroin in his underwear. The next day, after a signed consent in Spanish was secured from Gonzalez's sister, his Brooklyn apartment was searched by Officers Wodicka and Dennedy. A safe containing $2000 in cash, gold jewelry, a $6000 savings certificate, the telephone beeper, a phone guard, a rubber stamp bearing the

legend "Excellent," narcotics cutting material and paraphernalia, 24,000 glassine envelopes, 500 small bags, a number of plastic "Seal-A-Meal" bags, an electronic digital scale, a triple beam balance, a "hot box" device for measuring the purity and melting point of heroin, a .357 Magnum, and .38 caliber high velocity and soft-point bullets were found in Gonzalez's apartment. In addition, business records of drug transactions with the name "Cartero," Gonzalez's alias, on them were seized including one register reading "Monday 5,000, Wednesday 5,000, Sunday 12,000, Monday 3,000, Wednesday 8,000, total 33,000."

After summation, both defendants entered guilty pleas to all charges except the § 848 count. The jury convicted both Gonzalez and Ayala of conducting a continuing criminal enterprise. Upon the defendants' motion to set aside the § 848 convictions, the court set aside Ayala's conviction but allowed Gonzalez's to stand. Judge Sweet ruled that although sufficient evidence existed to prove that both defendants supervised five or more persons in their drug-related activities, only the proof against Gonzalez fulfilled § 848's additional requirement that substantial income or resources be gained from the enterprise.

Gonzalez was sentenced to concurrent terms of 12½ years for conspiracy to distribute, engaging in a continuous criminal enterprise and distribution of narcotics, a concurrent probationary term of four years on the various possession and distribution counts, a five year probationary term on the telephone counts, a special parole term of five years on the distribution count, and a $10,000 fine on the criminal enterprise count. Ayala was sentenced to concurrent seven year terms on the conspiracy and distribution counts, concurrent five year probationary terms on the various possession and telephone counts, and a special parole term of five years on the distribution count. The defendants are presently serving their sentences.

## DISCUSSION

To establish a violation of § 848, the government must prove that the defendant committed a series of felonious narcotics violations (i) "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management" and (ii) from which such person obtains substantial income or resources. 21 U.S.C. § 848(b) (1982).

■ The guilty pleas entered in the instant case establish the predicate felony violations required by § 848(b)(1) and (2). *See United States v. Young,* 745 F.2d 733, 746–52 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). We conclude that the jury had sufficient evidence to find that both Gonzalez and Ayala supervised or managed five or more persons. The 8th Street heroin distribution center had six to eight salaried employees who in turn supervised the 15 to 25 street runners. Both Gonzalez and Ayala were observed supplying Rentas with heroin and chalking up daily street runner rosters. Gonzalez also complained of the "headaches" involved with an expanded organization and appeared to operate two "Excellent" brand distribution centers. In making larger volume sales to Wodicka, he stated that he usually did not make direct sales but had others do it for him. Moreover, Feliciano testified that Gonzalez was characterized as the "boss" of the operation, a fact amply supported by the drug production assets and records seized from his apartment. Ayala occasionally supplied heroin to and paid the salaried employees, chalked up assignments, and for a two week period assumed Betancourt's position as street manager of the addict runners. These activities are sufficient to support a finding that he supervised five or more persons in the organization.

Our inquiry, therefore, focuses on § 848's substantial income or resources requirement. As to Gonzalez, the following physical evidence was presented to establish a substantial income:

(1) $2000 in cash, attributable to either or both Gonzalez and Ayala;

(2) $2000 in cash and $6000 in savings seized from his apartment as well as gold jewelry;

(3) drug records indicating gross sales of $33,000 over a ten day period;

(4) 36 grams of heroin; and

(5) substantial productive assets useful to a large scale narcotics production including sophisticated electronic scales and instruments and a safe.

■ We need not rely solely on these concrete indicia of wealth, for in making the substantial income or resources determination, we may also look to a variety of circumstantial, as well as direct, evidence. *United States v. Chagra*, 669 F.2d 241, 257 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). In doing so, we conclude that Gonzalez's claim of insufficient evidence fails.

■ Gonzalez had a franchise on a popular street brand of heroin protected by agreements he had negotiated with rival dealers embodying territorial and temporal trade restrictions. He operated two street outlets and made bulk sales to Wodicka as well. The structure of the 8th Street operation was hierarchical. At the top was Gonzalez. A second level was occupied by Betancourt as 8th Street manager, and there was a third level of six to eight salaried street distributors making $26,000 per year, exclusive of commissions. The lowest tier was composed of addicts and teenage street runners. A jury might well infer that a person in Gonzalez's position was making more than the $26,000 base pay of his street distributors two tiers below him on the 8th Street operation alone. Additionally, there were certainly profits on the 3rd Street operation as well as on the bulk sales to Wodicka.

This evidence is more than ample to permit the jury to conclude that Gonzalez made a substantial income from his drug enterprises. More direct evidence of his income or wealth—apartment rental, value of cars, personal effects, etc.—might have been helpful but was unnecessary. Quite apart from direct evidence of wealth, Gon-

zalez's position as the owner of "Excellent" brand heroin and his ambitious level of operation is sufficient circumstantial evidence, viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), to sustain the jury's verdict.

■ In reviewing Judge Sweet's setting aside of the verdict against Ayala, we must again view the evidence in the light most favorable to the prosecution. *United States v. Artuso*, 618 F.2d 192, 195 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980).

The government relies upon the following in asking us to reinstate the jury verdict:

(1) Ayala's position as Gonzalez's right-hand man including his statement that he and Gonzalez were "brothers";

(2) Ayala's functioning as the 8th Street manager;

(3) his role in paying the weekly salaries and commissions of the street workers;

(4) the reasonable inference that he received a "cut" of the sales of Officer Wodicka, $3800 of which were made by Ayala alone;

(5) the mink coat he was wearing at one drug sale, which, given his stated employment as a busboy, could be seen as the fruit of his drug dealings;

(6) the car and the $2000 in the trunk, seized when both Gonzalez and Ayala were arrested, attributable to Ayala alone or at least to both.

We agree with Judge Sweet that this is inadequate to sustain a finding with regard to the substantial income element. Section 848 was added in 1970 in order to provide severe penalties for kingpins in the drug trade, including prison terms of ten years to life, fines of up to $200,000, and automatic forfeiture of property. H.Rep. No. 1444, 91st Cong., 2d Sess. 10, *reprinted in* 1970 U.S.Code Cong. & Ad.News 4566, 4575–76. To that end, Congress required proof of the requisite supervisory role *and*

substantial income as a means of identifying kingpins. In Gonzalez's case, we permitted an inference of the latter to be drawn from his dominant position in a large hierarchical operation, distributing an exclusive brand of heroin. There is no such evidence that Ayala played such a role, however, and the direct evidence of Ayala's income or wealth is clearly insufficient.

Although we must view the evidence in the light most favorable to the government, we must also view it as a whole and not permit inferences to be drawn against Ayala which are inconsistent with the evidence against Gonzalez. We believe the ample evidence of Gonzalez's control over the drug operation in question and his relationship to Ayala reveals Ayala to have been without any independent authority or role apart from carrying out Gonzalez's orders. At best the record supports an inference that Ayala acted as Gonzalez's errand boy. His brief tenure as street manager indicates that Gonzalez viewed him as no more than a temporary replacement for Betancourt while complaints about the latter were sorted out. His delivery of weekly salaries to the salaried runners does not support an inference that he was making any particular amount of money. His solo deliveries of heroin to Officer Wodicka, accompanied by reassurances that he was Gonzalez's "brother," merely underline Gonzalez's dominant role and the latter's expressed practice of protecting himself from police surveillance by using underlings to make sales. The evidence thus falls woefully short of establishing that Ayala held a hierarchical position which might circumstantially support an inference of substantial income or wealth.

The government presented no direct evidence of Ayala's wealth other than the occasion when he wore a mink coat, the car, and the $2,000 seized when he and Gonzalez were arrested. No evidence of ownership or authenticity of the coat was offered and, although Ayala was repeatedly observed by surveillance officers during the winter months, he was not seen wearing it on any other occasion. Given the master and minion relationship between Gonzalez and Ayala, it is not possible to attribute any particular portion of the $2,000 or the car to Ayala. The record shows only that whatever income Ayala received from the drug operation was entirely at Gonzalez's discretion. What amounts were involved is not demonstrated by the evidence proffered.

Although we have opined that "neither the statute nor the cases establish a *minimum* amount of 'income or resources' required to make § 848 applicable," *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982) (emphasis in original), some line inevitably must be drawn. *Losada* itself involved multiple kilogram sales of cocaine engineered by someone who processed large amounts of drug money. In that case, the government demonstrated that she paid substantial amounts for school tuition, bail, attorney's fees, clothing, jewelry, a house in Colombia as well as several large airline fares, all far in excess of her legitimate income. Given this proof, *Losada* is not inconsistent with our holding in the instant case. In contrast to *Losada*, the government made no similar showing here as to Ayala. Unless we are to ignore § 848's requirement that defendants derive substantial income from the criminal enterprise and the legislative purpose of increasing sanctions for kingpins in the drug trade, rather than their personal errand boys, we must hold this proof insufficient.

We have considered appellant Gonzalez's other claims and conclude that they have no merit.[1]

We therefore affirm both Gonzalez's § 848 conviction and the district court's order setting aside Ayala's conviction.

---

1. The government has instituted a forfeiture proceeding thereby rendering moot Gonzalez's claim that his property was forfeited without due process of law.