**UNITED STATES of America, Appellee,**

v.

**Libertad CRUZ, Appellant.**

**No. 6, Docket 84–1251.**

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1985.

Decided March 6, 1986.

Edward Gasthalter, Hoffman, Pollok & Gasthalter, New York City (John L. Pollok, of counsel), for appellant.

Neil S. Cartusciello, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty. for the S.D. N.Y., Celia Goldwag Barenholtz, Warren Neil Eggleston, Asst. U.S. Attys., of counsel), for appellee.

Before FEINBERG, Chief Judge, LUMBARD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal has involved ineffective and incompetent assistance of counsel on appeal by the same attorney who represented Libertad Cruz at trial. Following the sentencing of this 64-year-old defendant to consecutive terms of imprisonment totalling 26 years plus a lifetime special parole term, an appeal was withdrawn in order to give the district court jurisdiction to hear a new trial motion. Upon denial of that motion, a timely appeal was followed by this court's rejection of the appellant's brief as totally inadequate. A second brief was filed, which improved little on the first, if at all. Prior to a determination by this court whether to reject this brief, and after denying counsel's request to submit this appeal without oral argument, counsel confessed that the briefs had been prepared by a "paralegal" and not examined by counsel, who is not even a member of the bar of this court. Counsel sought, and was granted, leave to hire at his expense appellate counsel to file a proper brief. New counsel did so and raised a number of points requiring discussion, not the least of which is that original counsel inadequately represented Cruz at trial. After a study of the record and the points made, we affirm the judgment of the United States District Court for the Southern District of New York, Shirley Wohl Kram, Judge.

Cruz and co-defendants Jose Marquez and Abraham Reyes were charged in a superseding indictment of six counts with narcotics and firearm violations.[1] Cruz, tried alone because his co-defendants were fugitives, was found guilty on all counts. Sentence was deferred on Count One, the conspiracy count (21 U.S.C. § 846 (1982)), in light of its merger with Count Two, the continuing criminal enterprise count, 21 U.S.C. § 848 (1982), under *United States v. Mourad*, 729 F.2d 195, 202–04 (2d Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985), pending final determination of this appeal. Cruz was sentenced to consecutive terms of imprisonment of ten years on the continuing criminal enterprise count and five years on each of Counts Three, Four, and Five, substantive counts for possession with intent to distribute and distribution of specified quantities of heroin, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (1982). He was also sentenced to one year on Count Six, carrying a firearm unlawfully during the commission of a felony in violation of 18 U.S.C.

---

1. The original indictment did not include a continuing criminal enterprise count under 21 U.S.C. § 848 (1982).

§ 924(c)(2) (1982).[2] The judge added a life-time special parole term following the completion of sentence on Counts Three, Four, and Five.

On appeal Cruz raises four claims. The first is that trial counsel's performance was deficient and prejudiced Cruz under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He claims he was deprived of a fair trial in that counsel (A) failed to challenge the validity of a search warrant or object to the admission of the evidence seized thereunder, (B) filed seriously deficient Rule 33 motion papers which revealed a failure to exercise due diligence to discover evidence prior to trial, and (C) engaged in argumentative courtroom conduct, the cumulative effect of which was to prejudice the jury against Cruz. Appellant's second claim is that the evidence was insufficient to support the conviction on the continuing criminal enterprise count because it did not show that there were five or more persons with respect to whom Cruz occupied the "position of organizer, a supervisory position, or any other position of management" or show that he obtained substantial income or resources from the continuing criminal activity. 21 U.S.C. § 848(b)(2). *See United States v. Young*, 745 F.2d 733 (2d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). The third point is that Cruz's Sixth Amendment right to counsel under *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), was violated by the introduction of inculpatory statements elicited from Cruz by Raj Tuli, a jailhouse informant. Cruz's fourth argument is that it was erroneous to admit evidence that one Mojica had participated in an unrelated heroin transaction resulting in his incarceration, in order to corroborate the testimony of Tuli that in the Metropolitan Correctional Center (MCC) he, Mojica, and Cruz discussed the importation of heroin from India. This evidence was supplemented by evidence that a telephone at Cruz's residence had been used to call telephones utilized by Mojica. The totality of this evidence, all dealing with an uncharged crime, is said to have been prejudicial. We affirm.

*Evidence Before the Jury.* The chief testimony against Cruz was adduced from Wilfredo Rodriguez, a former employee of Cruz's operation, who testified concerning the period of time between May and the end of August, 1982. The Government's evidence established that commencing at least as early as May, 1982, Cruz ran a heroin and cocaine cutting, packaging, and distribution business in an apartment building he owned at 54 Featherbed Lane in the Bronx. From Mondays through Saturdays Marquez, Reyes, and Rodriguez would assemble in Marquez's home (one of the apartments at 54 Featherbed Lane) where Cruz delivered the day's supply of high purity heroin and cocaine. Marquez did the cutting and Rodriguez and Reyes divided and packaged the drugs into glassine envelopes known as "dime bags," each of which was stamped with a brand name— "Goya" for the heroin and "Two-Way" for the cocaine. Rodriguez then delivered to a man named Jose at 143rd Street and Willis Avenue in the Bronx; Reyes delivered to a man at 179th Street and Anthony Avenue, also in the Bronx. In the afternoon Rodriguez and Reyes would collect $7,000 to $8,000 from each of the two street sellers and take the money to Marquez who turned it over to Cruz. Marquez, Rodriguez, and Reyes all received weekly salaries. Rodriguez also obtained from Cruz heroin and cocaine for his personal use. The two street sellers earned a commission of 30% on the heroin they sold.

In addition to the street-selling operation, every week or so Cruz would sell seven or eight ounces of uncut heroin to an unindicted co-conspirator who transported it to Puerto Rico. On three occasions Cruz also provided high quality heroin to Rodriguez, who in turn sold it to Drug Enforcement Administration ("DEA") agent, Robert

---

**2.** All citations herein to 21 U.S.C. § 841 and 18 U.S.C. § 924 are to the statutory provisions primarily or to amendment by Pub.L. No. 98–473, §§ 502, 1005, 98 Stat. 2068, 2138 (1984).

Strang. On July 15, 1982, Cruz gave Rodriguez a small quantity of heroin, which Rodriguez sold to Strang for $225. On July 30, 1982, Cruz gave Rodriguez an ounce of heroin, which Rodriguez sold to the agent for $11,500, of which Cruz took $10,000 and Marquez and Rodriguez split the remaining $1,500. On August 25, 1982, Cruz gave Rodriguez about four and one-half ounces (almost an eighth of a kilogram) of heroin, which Rodriguez delivered to Agent Strang. At that point Rodriguez was arrested, and he later agreed to cooperate.[3]

On October 12, 1983, Cruz was arrested in his apartment at 54 Featherbed Lane. During a search of the apartment, DEA agents found a loaded automatic pistol; a quantity of zip-lock plastic bags; a strainer bearing traces of 89.8% pure cocaine; a quantity of lactose; a heat sealer, inside of which was a zip-lock bag containing traces of cocaine; a "hot box" (a newly developed device for testing the purity of heroin and cocaine); and $12,125 in cash.

On March 22, 1984, during the second week of Cruz's trial, DEA agent Strang obtained a warrant to search another apartment rented by Cruz at 3535 Rochambeau Avenue in the Bronx. This search uncovered a booklet showing crystal formations of cocaine; kitchen utensils including a blender, a colander, Baggies, and Saran Wrap; and six small pieces of paper containing handwritten notes. The kitchen contained no refrigerator and no food. There was a bedroom set, but no box spring or mattress in the bedroom.

Another cooperating witness, Raj Tuli, testified that while he and Cruz were detained at the MCC awaiting trial, they discussed a heroin importation scheme. Tuli, who had been detained at the MCC since he was arrested at Kennedy Airport while attempting to smuggle heroin into the United States, had met Mojica, who was not at that time an inmate, in the MCC visiting room in July, 1983. During the visits, Tuli

and Mojica had discussed a scheme for importing heroin from India. Following Cruz's arrest he was placed on the seventh floor of the MCC, where Tuli resided. Mojica introduced them following his arrest on October 21, 1983, telling Tuli that Cruz was "like my father" and was his "business partner." According to Tuli, Cruz, Mojica, and he discussed a plan to organize a regular heroin smuggling operation to import two kilograms of heroin from India every ten to fifteen days at a price of $75,000 per kilo, with Cruz agreeing to pay front money of $15,000 or $20,000 for the initial shipment.

To "corroborate" Tuli's testimony, the Government introduced evidence of another attempt by Mojica to purchase heroin during roughly the same period as well as evidence of the prior relationship among Cruz, Mojica, and Mojica's drug associates. Agent Yvette Torres testified that Mojica was arrested on October 21, 1983, along with Victor Ayuso, Daisy Rodriguez, and Eva Agostini, when they attempted to buy five kilograms of heroin from undercover DEA agents in a "reverse sting" operation that had commenced in August, 1983. Pen register and telephone company records showed numerous telephone calls from Cruz's phone to phones belonging to Mojica, Ayuso, and Daisy Rodriguez during June, July, and August, well before their arrests. It was also shown that Mojica's and Ayuso's telephones had nonpublished numbers listed under false names.

Testimony on behalf of the defense was to the effect that Cruz's purchase of two apartment buildings on Featherbed Lane had been for nominal sums of cash and not with proceeds of an illegal narcotics enterprise, with Cruz and his family doing the work to rehabilitate the buildings. The superintendent of one of the buildings testified that he had found the "hot box" in Jose Marquez's old apartment and had brought it to Cruz's apartment without opening it. Anna Rodriguez, at that time

---

**3.** These three sales from Rodriguez to Agent Strang were the three substantive narcotics counts in the charge against Cruz.

living with Cruz, attempted to corroborate the superintendent's testimony and also testified that the heat sealer and zip-lock bags were innocuous household items and that the small bag with cocaine traces had not been inside the heat sealer when it was seized by the agents. She claimed that the cash was rent money (each of the apartment houses had some sixty units) and she claimed that the handwritten records seized were actually records of fuel oil purchases and not narcotics records as the agents had testified. She claimed that the "½ brown" on those records was a reference to No. 6 fuel oil and the "white" reference on those records was to No. 4 fuel oil, and that she used these phrases "½ brown" and "white" so as to avoid putting numbers (No. 6 or No. 4) next to the numbers of gallons of fuel oil purchased. An accountant testified that it was conceivable for Cruz to have had about $12,000 from rent receipts in his apartment on the day of his arrest and also said that fuel oil consumption may have amounted to about $50,000 to $60,000 annually for each of Cruz's buildings. Cruz himself testified that he did not know Wilfredo Rodriguez, the Government's chief witness; he denied the discussions in the MCC with Tuli and Mojica; and he offered exculpatory explanations for the narcotics paraphernalia found in his apartment, stating that he was merely a cocaine user.

Sometime after the jury verdict against Cruz, Mojica advised the Government that he wished to cooperate. He acknowledged that Cruz was indeed "like a father to him," that he had used the expression when he introduced Tuli to Cruz, and that he had met Tuli before his own arrest in connection with an earlier proposed venture to import heroin from India. According to an affidavit of an Assistant United States Attorney, however, Mojica denied that after his arrest he had participated in serious discussions with Tuli and disclaimed knowledge as to whether Tuli and Cruz had ever discussed a plan to import heroin from India, although he suggested that they may have been "dealing behind his back." After implicating Cruz in narcotics dealings with Marquez and Reyes in an earlier statement, Mojica subsequently denied having been aware of narcotics dealings among the three, claimed not to remember whether Cruz had ever expressed a suspicion that Marquez and Reyes had "ratted" on him, and further claimed not to remember whether he had ever said anything to the contrary. When the Government disclosed Mojica's statements to the court and defense counsel at sentencing, Cruz moved for a new trial under Fed.R. Crim.P. 33, a motion that was denied on the ground that Cruz had failed to exercise diligence in attempting to obtain Mojica's testimony before or during trial and that, in any event, there was no probability that Mojica's statements would have resulted in an acquittal.

## DISCUSSION

I. *Ineffectiveness of Counsel.* As the Government points out, there is a question whether on direct appeal, without having raised the issue below, Cruz can raise the question of ineffectiveness of trial counsel. Ordinarily, he would have to do so either in a motion for a new trial pursuant to Fed.R. Crim.P. 33 or for collateral relief pursuant to 28 U.S.C. § 2255 (1982). Indeed, were we to deem the claim viable, we would very likely have to remand to the district court for the purpose of developing a full factual record following an evidentiary hearing. *See United States v. Aulet,* 618 F.2d 182, 185–86 (2d Cir.1980). Since we are convinced that resolution of the issue is "beyond any doubt," *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), however, we will consider the ineffectiveness claim on this appeal, especially in light of the time that has elapsed since conviction due to the very same counsel's ineffectiveness on appeal. We thus proceed to the merits of the claim.

 Cruz claims that trial counsel's failure to controvert the search warrant for his Rochambeau Avenue apartment, his failure to interview Jose Mojica, and his alleged "argumentative" courtroom behavior individually and collectively constitute

ineffective assistance. To prevail on such a claim the defendant must overcome a presumption that his counsel's conduct was reasonable and meet the two-prong standard of, first, showing that it fell below "an objective standard of reasonableness" under "prevailing professional norms," *Strickland,* 104 S.Ct. at 2065, and, second, "affirmatively prov[ing] prejudice," that is, demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2067–68. *See also United States v. Bari,* 750 F.2d 1169, 1182 (2d Cir.1984), *cert. denied,* ― U.S. ――, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Moreover, in making the first determination required under *Strickland's* two-pronged analysis we must not utilize hindsight but rather "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 104 S.Ct. at 2066.

Under these standards Cruz has failed to satisfy his burden of proving ineffectiveness. He has not demonstrated that counsel's assistance at trial or before trial was inadequate or unreasonable nor has he established prejudice.

Before trial, counsel was assisted by two associates in his firm. Prior to trial he filed three sets of pretrial motions that sought extensive discovery and particulars, suppression of physical evidence, suppression of Cruz's post-arrest statements, dismissal of certain counts of the original (and later the superseding) indictment, severance of counts, pretrial rulings excluding numerous items of evidence on grounds of unfair prejudice, and a pretrial ruling limiting cross-examination of Cruz as to his prior narcotics conviction. This type of pretrial work is quite demonstrative of the reasonableness of counsel's conduct. The only two ways in which his non-trial work is faulted are in reference to the Rochambeau Avenue search warrant and in not adequately investigating and then not calling Jose Mojica as a witness. We take these up seriatim.

By the time of the search, this court had already held, citing *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983), that, as here, "[o]nce a magistrate has made a determination on the issue of probable cause," a reviewing court's "after-the-fact examination of the papers is not to be *de novo* review." *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). We had also held that in close cases doubt should be resolved in favor of upholding the warrant. *United States v. Zucco,* 694 F.2d 44, 46 (2d Cir. 1982). Here, Agent Strang's affidavit in support of the warrant application indicated probable cause to believe that Cruz used the apartment in his narcotics business. While residing at 54 Featherbed Lane, Cruz was also paying rent on Apartment 4G at 3535 Rochambeau Avenue. He concealed his association with that apartment by not being listed in the tenant directory or on the mail boxes at the apartment house and by having the telephone service to the apartment in the name of "Lizette Cruz" with an unpublished number. Low electrical usage for the apartment indicated that it was used infrequently. In addition, Cruz rented a parking space in the basement of the building, which the Government says permitted whoever actually used the apartment to enter or leave it with a minimal risk of being seen.

Agent Strang's affidavit also summarized the evidence that Cruz, prior to his arrest, had run an organization engaged in the distribution of substantial quantities of heroin and cocaine and that he had continued to engage in narcotics dealings following his arrest and incarceration in the MCC. The affidavit also identified each of the sources of Agent Strang's information and provided the basis for believing them reliable. The agent also ventured his opinion that, based upon his experience, narcotics dealers "customarily" maintain apartments and other locations apart from their residences in furtherance of their business for the storage of drugs, paraphernalia, or money, or all three. We have held that a magistrate is entitled to credit

such an expert opinion. *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985); *Young,* 745 F.2d at 758. Appellant asserts that the absence of any evidence that Cruz or any of his associates ever utilized Apartment 4G undermines Agent Strang's expert conclusion. Although it is true that no agent saw Cruz or his associates use the apartment, the affidavit reported information from the landlord that Cruz personally rented both the apartment and the parking space in the building, personally paid the rent, usually by cash or money order, and had personally provided an explanation for his desire for the apartment. We are confident that the "totality-of-the-circumstances" presented in the affidavit permitted a magistrate "mak[ing] a practical, common-sense decision," *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332; *see Young,* 745 F.2d at 758, to conclude that probable cause existed. Thus, even if trial counsel had moved to suppress the evidence, there is little likelihood that the motion would have succeeded, and appellant therefore fails to meet the "prejudice" prong of *Strickland.*

Certainly counsel's failure to move to suppress under the circumstances was not unreasonable. The Government's argument that the failure to controvert the search warrant may have been a tactical maneuver enabling the defense to use the largely innocuous evidence seized in the search, while not particularly persuasive, is not completely implausible. Most likely counsel was merely making the best of a difficult situation.

■ Defense counsel's decision not to call Mojica as a witness was not unreasonable. Counsel requested and received considerable information from the Government about Mojica, including documents seized from him and his coconspirators, reports of the arresting agents, and pen register tapes showing calls from Cruz to Mojica and his coconspirators.[4] Calling Mojica as

a witness would have permitted the Government not only to emphasize Mojica's own large-scale heroin dealings and the nature and extent of his relationship with Cruz but could have opened the door to cross-examination regarding Mojica's knowledge of Cruz's dealings with Marquez and Reyes at 54 Featherbed Lane. Beyond this, it is plain that there is no indication whatsoever of prejudice. Mojica's statements to the United States Attorneys after he decided to cooperate were hardly exculpatory of Cruz, and were inconsistent and ambiguous. At best, Mojica may have somewhat undermined Tuli's credibility, but, more likely, as the trial judge found in denying Cruz's new trial motion, any testimony by Mojica would have "on the whole, strengthen[ed] the Government's case."[5] This case was not altogether weak: a "hot box," which has no practical use other than testing the purity of heroin and cocaine, was found in the apartment; both the heat sealer and strainer had traces of cocaine; and Ms. Rodriguez's handwritten notes hardly suggest— as was advanced—fuel oil consumption when viewed in the light of the accompanying adjectives—"½ brown" and "white"— which have meaning in the narcotics trade even to appellate judges.

■ We have reviewed the transcript relative to trial counsel's behavior at trial, especially because of his demonstrated appellate incompetence. Even though from time to time he incurred the judge's ire, this usually occurred not in the presence of the jury, but at the bench or in the robing room. His conduct before the jury was combative, but he was following a technique often used by trial counsel. If anything, we think that the trial judge showed great restraint and much care in handling counsel's argumentativeness before the jury, while making her admonitions only in the confines of conferences at the bench or

---

**4.** The record is silent as to whether trial counsel ever interviewed Mojica before trial.

**5.** Although the failure to call Mojica was not ineffective assistance of counsel, we do not condone the utterly inadequate Rule 33 motion

papers. Because we agree with Judge Kram's careful decision that Mojica's statements do not require a new trial, we find that the inadequacy of these motion papers did not prejudice Cruz.

in the robing room. We also are fully aware that in the kind of desperate situation that trial counsel faced—where the evidence against his client was, to say the least, overwhelming and his client's defense bordered on the farfetched—counsel was attempting the old trial tactic of surrounding himself with the cloak of righteous indignation at "one-sided" treatment, a tactic that, when others prove unworkable, has sometimes been utilized with success. Counsel's closing argument emphasizing this position was well done.

In short, we see no need for a remand for an evidentiary hearing on the subject of ineffective assistance of counsel at or before trial on any of the grounds suggested.

■ II. *Sufficiency of the Evidence of a Continuing Criminal Enterprise.* As to the sufficiency of the evidence to sustain the conviction on the continuing criminal enterprise count, there is little question that appellant "occupie[d] a position of organizer, a supervisory position, or any other position of management" with respect to at least *five* other persons with whom he acted in concert with respect to the federal narcotics law violations. 21 U.S.C. § 848(b)(2)(A) (1982); *see, e.g., United States v. Ayala,* 769 F.2d 98, 101 (2d Cir. 1985). Rodriguez testified that Cruz was in charge of and supplied heroin and cocaine to an organization that cut, packaged, labeled, and distributed the drugs on the street at least six days a week. Rodriguez's testimony indicated that Marquez, Reyes, Jose at 143rd Street, and a man at Anthony Avenue, as well as Rodriguez himself, were part of this organization, leaving aside the sixth person who regularly transported heroin on a wholesale basis to Puerto Rico.[6] Under *United States v. Wilkinson,* 754 F.2d 1427 at 1432 (1985), and *United States v. Losada,* 674 F.2d 167, 173–74 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982), we must determine whether there was sufficient evidence to establish that Cruz occupied a position of organizer or

supervisor or any other position of management with respect to the five cutters and distributors. While arguably Rodriguez testified that the two street sellers did not "work for" Cruz in the sense that they were not salaried employees, the evidence shows that they were franchise distributors earning commissions on consignments of heroin and cocaine prepared and distributed by the Cruz organization.

■ In our view, this evidence is sufficient to bring the appellant within the statute. Cases involving well-defined chains of command under the control of a "King Pin ... offer the clearest examples of organization, supervision, or management...." *United States v. Mannino,* 635 F.2d 110, 117 (2d Cir.1980). Even in a less structured enterprise, however, "the necessary showing can plainly be made." *Id.* The statute does not require personal contact between the leader and each underling. *See United States v. Becton,* 751 F.2d 250, 255 (8th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *United States v. Phillips,* 664 F.2d 971, 1034 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Such a requirement would permit major drug dealers to insulate themselves from the continuing criminal enterprise statute by dealing directly with only four or fewer underlings, a result Congress clearly could not have intended. Furthermore, the statute does not require that the same type of superior-subordinate relationship exist with each of the persons involved. *Mannino,* 635 F.2d at 117. Whether or not Cruz ever met the two streetcorner sellers, they clearly operated within an organization that he managed and organized. We will not read into the statute a distinction between salaried "employees" working directly under a "King Pin" and "independent contractors" or "franchisees" who deal only with subordinates.

---

**6.** In summation, the Government referred to Jose Mojica and Daisy Rodriguez as persons with whom Cruz acted in concert, but they were not named as persons supervised by Cruz.

■ III. *The* Massiah *Claim.* Cruz argues that the introduction of Tuli's testimony regarding information he obtained from Cruz while a government informant constitutes a Sixth Amendment *Massiah* (*Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)) violation under *United States v. Henry,* 447 U.S. 264, 269–75, 100 S.Ct. 2183, 2186–89, 65 L.Ed.2d 115 (1980). *See also Wilson v. Henderson,* 742 F.2d 741 (2d Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 3499, 87 L.Ed.2d 630 (1985). Here, the district court made an express finding that the Government did *not* deliberately seek to elicit information from Cruz by putting him on the same floor as Tuli in the MCC, however odd a coincidence it seems, especially in view of the fact that Tuli was already a government informant and Mojica turned out subsequently to be willing to cooperate with the Government. Indeed, Tuli's testimony focused on Mojica, with whom he had had prior dealings, and not Cruz. There is no indication that the agents and Assistant United States Attorneys who elicited Tuli's cooperation and information were playing any part in the investigation of Cruz, a factor which distinguishes this case from *Henry,* 447 U.S. at 271 n. 8, 100 S.Ct. at 2187 n. 8, and *Maine v. Moulton,* — U.S. —, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). The record shows that no incriminating statements elicited at Cruz's trial were obtained from Tuli after November 15, 1983, when the Government apparently first learned that Tuli had been speaking with Cruz. Thus, on the record before us, the Government did not intentionally create a situation likely to induce Cruz to make incriminating statements absent the assistance of counsel. *See Wilson,* 742 F.2d at 745; *cf. United States v. Garcia,* 377 F.2d 321, 324 (2d Cir.), *cert. denied,* 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967).

■ IV. *Admission of Mojica's Arrest.* We can quickly dispose of appellant's final argument that the district court committed error in admitting evidence that Mojica was arrested with Ayuso and Daisy Rodriguez while attempting to purchase heroin from DEA undercover agents, as well as evidence that during the summer of 1983 there were numerous calls from Cruz's telephone to Mojica, Ayuso, and Daisy Rodriguez. The evidence did have some value as corroborative of Tuli's testimony. Also, insofar as it related to Mojica's description of Cruz as his "business partner" and as "like a father" to him, it had a bearing upon Cruz's involvement in the continuing criminal enterprise. The district court is entitled to latitude in the admission of evidence indicating "background" in development of a conspiracy, *see United States v. Magnano,* 543 F.2d 431, 435 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977); *accord United States v. Torres,* 519 F.2d 723, 727 (2d Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975), and have also given credit to the trial judge's rulings under Fed.R.Evid. 403. The court was careful enough to give limiting instructions tying Cruz not to the alleged charges against Mojica but only to the testimony of Tuli concerning Cruz's alleged participation with Tuli and Mojica in the conspiracy to import heroin.

Judgment affirmed.[7]

7. In view of trial counsel's inadequate representation on appeal, combined with his confession of error in relying on a "paralegal" in connection with the filing of the totally inadequate and incompetent briefs before this court, were he a member of the bar of this court we would recommend that he be stricken from the rolls under the appropriate rules. Since he is not a member, we direct our clerk to forward a copy of this opinion to the appropriate state bar committee for consideration of discipline or censure under state court rules and to the Southern District's Committee on the Criminal Justice Act. We nevertheless recognize, in mitigation, the fact that trial counsel did ultimately seek to obtain and in fact obtained appellate counsel at his own expense to argue appellant's case before us. We commend such counsel for the work that they did. Were it not, however, for this court's prior recognition of the inadequacy of trial counsel's briefs before us a very serious injustice would have occurred, the seriousness of which is *not* mitigated by the affirmance of the conviction. This has been an unfortunate case in which we feel the good offices of the court have been toyed with by appellant's prior

counsel. We cannot help but express our view that were this conduct to be tolerated in other

cases, the work of this court or any appellate court would soon be adversely affected.