201 F.3d 61 (2nd Cir. 2000)
 UNITED STATES OF AMERICA, Appellee,
v.
ARCHIE JOYNER; TRACEY SMITH; KARIN JACKSON aka Karin Shuford; ERIC D. BRYANT aka E; SEAN L. BRYANT; CRAIG GILLESPIE, aka Mountain; CLARENCE BROWN aka Lo; DAVID SCHON aka Crazy Dave; GREGORY Y. BOWLES aka Shun, aka Young; SHATIMA TURNER aka Little; RUDOLPH W. GRIFFIN aka Rudy; JERRY LEWIS aka Luwan; NIGEL J. WILLIAMS; ODELL SHANNON DAVIS aka O; RICHARD JASON LAPSLEY aka Jay; JOHN C. POLLAK, JR. aka JP; BRIAN KEITH PARKS aka Bam Bam; DARREN M. RHODES aka D, aka Dee Dee; YOLANDA TURNER aka Landis; ASARIAH JEFEREYS aka Eyes, aka Bebo; COLIN M. JONES aka C; SERITA THOMPSON; REGINALD PERRY aka Trooper, aka Man Big; MELVIN E. DOVE aka Tony, aka Tyson, aka Mel; ANTHONY A. DEVIVO aka Tony; JON P. GARDELLA aka Limpy, aka John; SHAROLYN C. CANTY aka Lynne; HELENA J. MCFARLANE aka Helena; KEVIN J. MICKENS aka Mel, aka Jamel; BRIDGET WILLIAMS; GERALD M. JIGGETS aka G, aka Jerry, aka G-man; MALKIA M. ROBINSON, aka Makia; VLADIMIR L. VINCENT aka Ricky Vlige, aka Vito; DARRYL L. WILLIAMS aka Bookie, aka John Bowens, Defendants,
JESSE M. CARTER aka Uncle Jess; CARLOS CHARLES; TEDDY T. ATKINSON; RAYMOND A. COLLINS aka Ray, aka Ron Turner; MICHAEL BARRETT aka Mike Mike; CRAIG SWEAT aka Tank; WILLIAM H. WILLOGHBY aka Crush, Defendants-Appellants.
 Docket Nos. 96-1198, 96-1720, 96-1721, 97-1069, 97-1196, 97-1197, 97-1292, 98-1176, 98-1177
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: Feb. 8, 1999
Decided: Jan. 10, 2000
 
 Appeals from convictions and sentences in the United States District Court for the Northern District of New York (Thomas J. McAvoy, Chief Judge). We vacate certain drug conspiracy convictions, reverse certain firearm convictions, and vacate a portion of the sentence requiring restitution. We affirm in all other respects.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 THOMAS E. BOOTH, United States Dept. of Justice, Criminal Division, Washington, D.C. (Thomas J. Maroney, United States Attorney, Northern District of New York, Miroslav Lovric, Assistant United States Attorney, on the brief), for Appellee.
 MARJORIE M. SMITH, Englander & Smith, Tappan, New York, for Defendant-Appellant Teddy T. Atkinson.
 MELYNDA COOK, Schad, Buda, Lucia & Cook (Kevin M. Schad, of counsel), Cincinnati, Ohio, for Defendant-Appellant Jesse M. Carter.
 DARRELL B. FIELDS, Legal Aid Society, Federal Defender Division, New York, New York, for Defendant-Appellant Carlos Charles.
 MICHAEL YOUNG, New York, New York, for Defendant-Appellant Raymond A. Collins.
 JAMES E. LONG, Albany, New York, for Defendant-Appellant Michael Barrett.
 Richard L. Mott, Albany, New York, for Defendant-Appellant Craig Sweat.
 DENNIS CLAUS, Syracuse, New York, for Defendant-Appellant William Willoghby.
 Before: WINTER, Chief Judge, CARDAMONE, and PARKER, Circuit Judges.
 WINTER, Chief Judge:
 
 
 1
 From 1989 to 1995, Archie Joyner operated a drug trafficking ring in Binghamton, New York. Forty-one individuals, including appellants Teddy T. Atkinson, Jesse M. Carter, Carlos Charles, Raymond A. Collins, William Willoghby, Michael Barrett, and Craig Sweat, were indicted for offenses arising out of the ring. Atkinson, Carter, Charles, Collins, Barrett, and Sweat pleaded not guilty. After an eight week jury trial before Chief Judge McAvoy, in which Joyner was the government's key witness, the jury convicted: (i) Atkinson of engaging in a continuing criminal enterprise ("CCE"), see 21 U.S.C. 848, of drug trafficking conspiracy, see 21 U.S.C. 846, and of possession of cocaine with intent to distribute and cocaine distribution, 21 U.S.C. 841(a)(1); (ii) Carter of engaging in a CCE, of drug trafficking conspiracy (subsequently vacated by the district court), of attempted cocaine distribution, cocaine distribution, and possession of cocaine with intent to distribute and of using and carrying a firearm during a drug trafficking offense, see 18 U.S.C. 924(c); (iii) Charles of engaging in a CCE, of drug trafficking conspiracy, of cocaine distribution and possession with intent to distribute and of using and carrying a firearm during and in relation to a drug trafficking offense; and (iv) Collins of arson conspiracy, see 18 U.S.C. 371, and arson, see 18 U.S.C. 844(i). The jury was unable to agree on a verdict with respect to Barrett and Sweat. On retrial, however, both were convicted of a CCE and of drug trafficking conspiracy. Willoghby pleaded guilty to drug trafficking conspiracy. Judge McAvoy sentenced: (i) Atkinson to 292 months' imprisonment, (ii) Carter to 360 months' imprisonment, (iii) Charles to 392 months' imprisonment, (iv) Collins to life imprisonment, (v) Barrett to 262 months' imprisonment, (vi) Sweat to 262 months' imprisonment, and (vii) Willoghby to 36 months' imprisonment. The court also ordered Collins to pay $1,846,637.45 in restitution. These appeals followed.
 
 
 2
 The evidence amply supports the various CCE convictions. However, because a drug conspiracy is a lesser included offense of a CCE, see Rutledge v. United States, 517 U.S. 292, 300 (1996), we vacate the drug conspiracy convictions of Atkinson, Charles, Barrett, and Sweat. We also vacate Carter's firearm convictions on Counts 44, 47, and 48, and Charles's firearm convictions on Counts 46, 47, and 48 for insufficient evidence. Finally, because the sentencing court failed to consider the factors specified in 18 U.S.C. 3664(a), we vacate that portion of the sentence requiring Collins to pay $1,846,637.45 in restitution and remand for further consideration. Otherwise, we affirm.
 
 BACKGROUND
 
 3
 We briefly describe the evidence leading to appellants' convictions, in all its dreary repetition, in the light most favorable to the government. See Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 4
 Joyner began his drug trafficking operation in 1989. He bought cocaine in New York City, transported it to Binghamton, distributed it to "sellers" at one of a number of Binghamton bars, and received a portion of the sellers' profits. In 1990, Joyner's longtime friend Carter followed him to Binghamton. Within less than three weeks, Carter was arrested at a bar called "Dell's" for possession with intent to distribute cocaine. Atkinson, another longtime Joyner friend, subsequently moved to Binghamton and formed a partnership with Joyner to sell cocaine at a bar called "Sail Inn." That partnership dissolved after Joyner discovered that Atkinson had stolen money from him. Joyner then recruited others to work for him as he expanded his operation.
 
 
 5
 In 1992, Joyner decided that managing a bar called "Amp's" would help him avoid police surveillance while selling cocaine. His organization also began to buy guns, which were kept in stash houses. In the spring of 1993, Carter returned to Binghamton to become one of the managers of Amp's. That summer, Joyner purchased a Binghamton bar called "Begie's." In the fall of 1993, Carter became a manager of that bar as well. At about the same time, Atkinson -- who was dealing drugs on his own after the dissolution of his partnership with Joyner -- was arrested for distributing cocaine. He was released after Joyner posted bail on his behalf. Following his release, Atkinson worked as a seller at Begie's in order to repay Joyner until the state court sentenced him to a prison term. At the end of 1993, Begie's lost its liquor license, was raided by police, and temporarily closed.
 
 
 6
 At about the same time, however, Joyner purchased another bar called "Sheion's." After Begie's was closed, Joyner moved Carter to Sheion's, but he needed a second manager at Sheion's to handle all the customers. Because Atkinson was still in prison, Joyner recruited longtime-friend Charles for that position. Joyner paid Charles for his services as manager by allowing him to sell cocaine, marijuana, and heroin at Sheion's. Willoghby, a cocaine addict, was a janitor at Sheion's and sold cocaine there for Joyner from time to time. On February 10, 1994, Carter was arrested in New Jersey for possessing almost 3,000 vials of cocaine in a car he and Joyner had borrowed. After Carter's release on bail several weeks later, he resumed managing Sheion's for Joyner.
 
 
 7
 At about the same time, Joyner reopened Begie's under the new name "Choice's" and allowed the leaders of a rival ring, Barrett and his lieutenant Sweat, to sell cocaine there in exchange for a percentage of their profits. At about the same time, Joyner began to purchase both cocaine and heroin from a new supplier, Reginald Perry. In May 1994, Joyner, Perry, and several others -- including Collins, whom Perry had worked with in New York and whom he had recruited for this job -- conspired to torch a Binghamton bar called "Dell's," the principal competitor of Sheion's. An elderly man, Willard Allen, died in the fire.
 
 
 8
 On June 17, 1994, the Binghamton and New York state police raided Sheion's and arrested Charles, Joyner, and several others. Charles and Joyner were subsequently sent to prison, where they have since remained. Joyner continued his drug operation from prison. Barrett visited Joyner frequently, and they agreed that the former organization would sell cocaine at Choice's at night (still splitting the profits with Joyner) and that Joyner's girlfriend, Tracey Smith, would sell on his behalf during the day.
 
 
 9
 At one point, Smith and Barrett clashed. Joyner sent his personal bodyguard, Craig Gillespie, to Choice's to bring peace. Within a few weeks, Barrett and his crew left. Subsequently, in the fall of 1994, Atkinson, who had recently been released from state prison, returned to Choice's and resumed drug-selling. Several months later, Gillespie began to cooperate with police, leading to the arrests and convictions of appellants.
 
 DISCUSSION
 
 10
 a) Atkinson
 
 
 11
 Atkinson challenges his CCE conviction on various grounds that we address in turn.
 
 1. CCE conviction
 A. Constructive amendment
 
 12
 Atkinson argues that his indictment alleged that he engaged in a CCE only through 1991 and that the government introduced evidence of his supervisory role in the Joyner enterprise during time periods and in locations not mentioned in the indictment. This evidence, he claims, constructively amended the indictment.
 
 
 13
 Atkinson bases his claim largely on the introduction to the indictment. However, the introduction does not purport to describe his role fully; it merely states that the "following defendants and coconspirators occupied the designated roles, among others, in the Joyner's organization." The roles listed are thus illustrative, not exclusive. Indeed, the indictment thereafter charged Atkinson and others with engaging in a CCE and managing and supervising at least five other persons from 1989 to 1995. The essential elements of the offense charged were therefore in no way modified by the government's evidence. See United States v. Rioux, 97 F.3d 648, 661-62 (2d Cir. 1996) ("A constructive amendment to an indictment occurs when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." (internal quotation marks omitted)).
 
 B. Supervision of five persons
 
 14
 To convict a defendant for engaging in a CCE, the government must prove a continuing series of violations, undertaken in concert with at least five other persons with respect to whom the defendant occupied a position of organizer, supervisor, or manager. See 21 U.S.C. 848(c). The evidence must also show that the defendant obtained substantial income or resources from the criminal actions. See id. Atkinson claims that there was legally insufficient proof that he organized, supervised, or otherwise managed five persons in Joyner's organization. We disagree.
 
 
 15
 There was evidence that Herbert Wells sold drugs owned by Atkinson and did so under Atkinson's direct supervision. Moreover, Tracey Smith, Joyner's girlfriend, testified that Atkinson frequently traveled to New York City with Joyner to obtain cocaine from their suppliers. There, Atkinson directed certain women, including Yolanda Harrison, to bag the cocaine for him, and other women, including Harrison and Iashia Duncan, to transport or "mule" the drugs upstate. Duncan testified that she understood Atkinson to be "Archie's man" and that she packaged and transported cocaine for Atkinson on at least one occasion. Harrison also testified that she packaged drugs at Joyner's house several times and that on one occasion, Atkinson paid her. Joyner testified that Carol Armstrong, one Angie, one Ayesha, and one Trish also served as mules during the Dell's/Sail Inn period of his partnership with Atkinson. He explained that "[w]e was using females on the bus muling it. . . . I didn't want to carry it. He didn't want to carry it." The evidence was therefore easily sufficient to permit a rational juror to find that Atkinson organized and supervised five persons, within Joyner's drug ring. See United States v. Polanco, 145 F.3d 536, 542 (2d Cir. 1998); see also United States v. Lindsey, 123 F.3d 978, 986 n.3 (7th Cir. 1997) (evidence that defendant employed people in various capacities is sufficient to establish that he was manager or supervisor).
 
 C. Aiding and abetting CCE
 
 16
 A defendant cannot incur criminal liability for aiding and abetting a CCE, see United States v. Amen, 831 F.2d 373, 381-82 (2d Cir. 1987), and the indictment erroneously charged Atkinson and other defendants with such an offense. Atkinson argues that although the district court's instructions to the jury explained that the defendants could not be held liable for engaging in a CCE under an aiding and abetting theory, it failed to caution the jury to disregard references in the indictment to aiding and abetting a CCE. Moreover, he claims that the court instructed the jury that the defendants could be liable for engaging in a CCE on the basis of coconspirator liability, without clarifying the difference between coconspirator and aiding/abetting liability. According to Atkinson, the jury's questions during deliberations revealed its confusion about this issue, and there is therefore a reasonable likelihood that the jury misapplied the instructions and impermissibly convicted him as an aider and abettor of a CCE.
 
 
 17
 Atkinson's argument is not without force. The indictment charged acts that are not a crime, and the court did not caution the jury specifically to disregard references in the indictment to aiding and abetting a CCE. However, in response to the jury's request that the court clarify aiding and abetting liability, the court explained that while a defendant could be found guilty of committing a predicate CCE felony based on an aider and abettor theory, he could not be convicted of a CCE simply for aiding and abetting a "kingpin." This was a correct statement of the law, see United States v. Aiello, 864 F.2d 257, 264 (2d Cir. 1988), and we must presume that the jury followed the court's instructions. See Shannon v. United States, 512 U.S. 573, 585 (1994) ("'[T]he almost invariable assumption of the law [is] that jurors follow their instructions.'" (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987))). We therefore conclude that the district court's failure to add other cautionary language to the charge was harmless.
 
 2. Drug conspiracy conviction
 
 18
 Because we uphold Atkinson's CCE conviction, we vacate his drug conspiracy conviction pursuant to Rutledge v. United States, 517 U.S. 292, 300 (1996) (holding that conspiracy is lesser included offense of CCE and that conviction and punishment under both violates Double Jeopardy Clause).
 
 3. Other counts
 
 19
 Atkinson next challenges his convictions on Counts 19, 20, 21 and 37. Count 19 charged Atkinson with aiding and abetting or conspiring with Marcia Forbes to possess cocaine with intent to distribute on November 2, 1993 at Begie's, during and in relation to the CCE and the conspiracy. Charge 20 charged him with aiding and abetting or conspiring with Tyrone J. Pinkney to possess cocaine with intent to distribute on November 2, 1993 at Begie's, during and in relation to the CCE and the conspiracy. Charge 21 charged Atkinson with aiding and abetting or conspiring with Marcia Forbes to distribute cocaine on December 2, 1993 at Begie's, during and in relation to the CCE and the conspiracy. And, Count 37 charged Atkinson with aiding and abetting or conspiring with Serita Thompson to possess cocaine with intent to distribute at Choice's on October 26, 1994, during and in relation to the CCE and the conspiracy.
 
 
 20
 Liability on these counts rests on a Pinkerton theory, see Pinkerton v. United States, 328 U.S. 640, 647-48 (1946); i.e., given Atkinson's role in the conspiracy, these particular crimes, which were committed pursuant to the conspiracy, were foreseeable by him. Atkinson argues that although the evidence might be sufficient to show that he conspired with Joyner to sell cocaine when they first moved to Binghamton, there was no evidence linking him to Joyner's larger conspiracy that involved the substantive crimes described above. And, because Forbes, Pinkney, and Thompson were Joyner's sellers, not his, Atkinson argues that there was insufficient evidence to establish that he was either an aider and abettor or a coconspirator of these individuals. We disagree.
 
 
 21
 The government proffered substantial evidence, described above, linking Atkinson to Joyner's ring. That evidence was easily sufficient to support the inference that Atkinson was part of the same overall Joyner conspiracy. See United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir. 1991) (government must prove that those conspiring with head of drug organization "knew of, or intended to join, a larger agreement between [that individual, here Joyner] and others to distribute drugs"); cf. United States v. Prince, 883 F.2d 953, 959 (11th Cir. 1989) ("[E]ven if the evidence arguably establishe[d] multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." (quoting United States v. Champion, 813 F.2d 1154, 1166 (11th Cir. 1987))).
 
 
 22
 With regard to the three transactions at Begie's, there was evidence that these sales were part of the overall conspiracy and that Atkinson had a working relationship with many of the coconspirators. During the time in question, Atkinson was not only selling drugs at Begie's but was purchasing them jointly with Joyner and splitting the profits. Moreover, Atkinson and Joyner traveled together to New York City to recruit David Schon to assist Gillespie in providing security at Begie's. As to the Choice's sale, Atkinson was serving at the time as a manager of Joyner's operations at the bar. Atkinson was therefore liable as a conspirator for these reasonably foreseeable crimes of his coconspirators.
 
 4. Calculation of criminal history
 
 23
 Atkinson also claims that the district court erred in calculating his criminal history level by including a 1994 state court sentence even though the state crime for which he was sentenced was part of his CCE offense. We disagree.
 
 
 24
 In calculating a defendant's criminal history category, a sentencing court must consider "any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." United States Sentencing Guidelines [hereinafter "U.S.S.G."] 4A1.2(a)(1). Application Note 3 to U.S.S.G. Section 2D1.5 provides that a sentence for a conviction sustained prior to the "last overt act of the instant offense" should be considered a prior sentence under Section 4A1.2(a)(1) and not part of the CCE offense for criminal history purposes. Atkinson concedes the relevance of Application Note 3 but argues that we must remand because the district court made no finding as to when the last overt act of the CCE occurred. The jury, however, convicted Atkinson on Count 37 of a drug crime in furtherance of the enterprise committed in October 1994. Because Atkinson's state drug offense and conviction occurred before this overt act, the state conviction in question was properly counted.
 
 
 25
 b) Carter
 
 
 26
 Carter, like Atkinson, makes a variety of arguments that we address in turn.
 
 1. CCE conviction
 A. Supervision of five persons
 
 27
 Although the jury found that he had managed or supervised 26 individuals, Carter contends that most of these individuals merely paid him a set price for the drugs and thereafter acted on their own. And, he claims, a buyer-seller relationship without more is insufficient to prove a managerial role under the CCE statute.
 
 
 28
 Other circuits have concluded that one does not qualify as an organizer for purposes of the CCE statute "if one simply sets up a system of supply." United States v. Jerome, 942 F.2d 1328, 1331 (9th Cir. 1991); see also Lindsey, 123 F.3d at 988 (evidence of fronting drugs is by itself insufficient to satisfy management requirement of CCE statute); United States v. Williams-Davis, 90 F.3d 490, 508-09 (D.C. Cir. 1996) (same); United States v. Witek, 61 F.3d 819, 823 (11th Cir. 1995) (same). However, that is not the issue here because Carter did far more than merely sell drugs to independent retailers. Joyner required his sellers to work in or near the bars so that Carter and the other managers could constantly monitor them. Joyner also required sellers to obtain permission from him or from the managers to make discounts to customers or to barter drugs for property. Moreover, Carter managed more than five women who worked as mules or baggers for the enterprise, often was present during these activities, and controlled the stash house where women bagged cocaine. Finally, Joyner and Carter distributed handguns to the security people at Begie's. The evidence thus amply supported the jury's finding that Carter managed or supervised more than five persons.
 
 B. Substantial income or resources
 
 29
 Carter next asserts that there was legally insufficient evidence that he derived substantial income or resources from the CCE. See 21 U.S.C. 848(c). He claims that the government showed only that he made a $1,400 downpayment on Begie's utility bill and purchased marijuana in 1994 for $1,200 to $1,800. According to Carter, the government's other evidence -- that Joyner paid Carter's expenses for rent, light, gas, telephone, clothing, and food from drug proceeds -- related to Joyner's income, not his.
 
 
 30
 Carter relies in this regard on United States v. Ayala, 769 F.2d 98, 102 (2d Cir. 1985), which held that the government had not proven the "substantial income" element even though it had shown that an underling of the drug organization's kingpin had once worn a mink coat and had been arrested in a car with $2,000 in the trunk. We reasoned that, based on the totality of the evidence, the underling lacked independent authority and merely carried out orders. Moreover,
 
 
 31
 [n]o evidence of ownership or authenticity of the coat [worn on one occasion] was offered . . . . Given the master and minion relationship between [the kingpin] and [the underling], it is not possible to attribute any particular portion of the $2,000 or the car to [the underling who was arrested in the car with the kingpin]. The record shows only that whatever income [the defendant] received from the drug operation was entirely at [his boss's] discretion.
 
 
 32
 Id. at 103.
 
 
 33
 Ayala is of little benefit to Carter because Joyner and Carter had more than a "master and minion" relationship. Carter was no mere "errand boy" or "gofer". Rather, he was Joyner's second-in-command. Given that Carter had no other source of income, the jury could have inferred that he paid his expenses -- i.e., the $1,400 downpayment and the $1,200-$1,800 purchase of marijuana -- with drug profits. Moreover, although Joyner paid Carter's rent, light, gas, telephone, clothing, and food, the payments were made from drug proceeds and constituted income-in-kind or substantial "resources" for purposes of the CCE statute. 21 U.S.C. 848(c)(2)(B); cf. United States v. Wilson, 116 F.3d 1066, 1088 (5th Cir. 1997) ("[T]he jury may infer substantial income from outward evidence of wealth in the absence of other, legitimate sources of income.") rev'd on other grounds, 161 F.3d 256 (5th Cir. 1998) (en banc). Carter's position in the drug operation, the large volume of weekly sales, Joyner's paying all of his expenses, and the approximately $2,500 in cash that he used to pay for the marijuana and the utility bill easily support the jury's finding that Carter obtained substantial income or resources from the CCE. See United States v. Roman, 870 F.2d 65, 75 (2d Cir. 1989) (jury could properly draw inference of substantial income from size of organization, volume of sales, and $2,500 in ready cash).
 
 2. Other counts
 
 34
 Carter also contends that his convictions on Counts 22, 23, and 24 should be reversed. His arguments have no merit.
 
 
 35
 Count 22 alleged that on February 10, 1994, Carter and others attempted to distribute cocaine. On that date, Carter was transporting cocaine in his car for resale at Sheion's when a law enforcement officer seized the cocaine and arrested him. Because the crime was complete when he took possession of the cocaine, his subsequent arrest is irrelevant. Counts 23 and 24 charged Carter with aiding and abetting or conspiring with certain named others to possess cocaine with intent to distribute at Sheion's on February 26, 1994, and March 1, 1994. Although Carter was incarcerated when those offenses occurred, he remained a coconspirator -- he soon emerged from jail to resume participation in the ring's drug-trafficking -- and was responsible for crimes that were foreseeable consequences of the conspiracy. A conspirator's arrest alone does not end his responsibility for his coconspirator's criminal acts. See United States v. Cruz, 797 F.2d 90, 98 (2d Cir. 1986).
 
 3. Firearm convictions
 
 36
 Title 18 U.S.C. 924(c)(1)(A) provides criminal penalties for one who, "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." However, Section 924(c)(1) requires evidence sufficient to show that the defendant actively employed the firearm to render it an operative factor in the predicate offense. See Bailey v. United States, 516 U.S. 137, 143 (1995). On appeal, Carter claims that the government proved only that he possessed the firearms. With respect to certain of the charges, we agree.
 
 
 37
 Count 41 alleged that from December 1992 through November 2, 1993, Carter, among others, knowingly used and carried a .380 calibre semi-automatic handgun during and in relation to drug trafficking crimes, in that he "reasonably foresaw that coconspirators would carry [or] use . . . such firearms during and in relation to the Continuing Criminal Enterprise and the Conspiracy as alleged in Counts 1 and 2 of this Indictment." Carter's conviction on this count was more than sufficiently supported by Joyner's testimony that a few weeks prior to November 2, 1993, he and Carter regularly gave the .380 handgun to security at Begie's to protect Joyner's drug operations. Thus, although Joyner also testified that Carter himself never carried the handgun when working at Begie's, Carter furthered the conspiracy by giving the gun to security people.
 
 
 38
 Count 42 alleged that on November 2, 1993, Carter knowingly and unlawfully used the same .380 handgun in connection with drug trafficking crimes in that he reasonably foresaw that coconspirators would use the firearm during and in relation to the drug offense alleged in Count 19. Count 43 alleged that on the same date, Carter used the gun in connection with a drug crime in that he reasonably foresaw that coconspirators would use a firearm during and in relation to the drug crime alleged in Count 20. The evidence supported Carter's convictions on both these counts.
 
 
 39
 On November 2, 1993, Gillespie and Schon both carried the .380 calibre handgun in Begie's as security. Later that day, law enforcement agents raided the bar, arrested Marcia Forbes and Tyrone Pinkney for cocaine possession, and seized the handgun, which had been thrown behind a jukebox. Carter could thus be held accountable as a coconspirator for Gillespie's and Schon's carrying of the handgun during and in relation to Forbes's and Pinkney's drug offenses. Carter's contention that Counts 41, 42, and 43 must be vacated because they involve the same gun on the same day is frivolous. Because each count was linked to a separate drug trafficking offense, Carter was properly convicted of multiple Section 924(c)(1) violations. See United States v. Lindsay, 985 F.2d 666, 674 (2d Cir. 1993) (unit of prosecution in Section 924(c) offense is underlying drug trafficking offense, not the firearm).
 
 
 40
 With respect to Count 44, however, we agree with Carter that the evidence was legally insufficient. That Count alleged that during November 1993 and on June 17, 1994, Joyner, Carter, and Gillespie used and carried an M16 semi-automatic rifle. In its brief, the government asserts that Carter kept the rifle together with cocaine in a shed, that he once took the firearm to Sheion's during a dispute with a customer, and that on another occasion he carried the rifle to a stash house. The government relies upon Gillespie's and Joyner's testimony to support its claim. However, Gillespie's testimony states merely that he and Carter took the M16 from Sheion's to the shed in the back of Carter's house. When asked whether that shed was ever used for cocaine, Gillespie responded: "Not to my knowledge, no." Joyner testified only that Carter took the rifle to Sheion's during a dispute with a customer, explaining: "I remember a day when an individual named Calvin was rattling off with his mouth. He was drunk and he was talking about he had a gun, he was going to get some guns." There is no indication that such dispute was drug related. Thus, the government did not carry its burden of proof on this count.
 
 
 41
 The evidence pertaining to Counts 47 and 48 is also legally insufficient to support a conviction. The government claims that Carter drove the car in which Darren Rhodes carried two firearms -- a loaded Ruger Security Six .357 handgun and a loaded Ruger .22 calibre long rifle semi-automatic handgun -- after removing them from Sheion's. However, the transportation of these weapons was intended to preclude their seizure by police and was not shown to be related to particular drug trafficking.
 
 
 42
 Count 49 alleged that Carter, Joyner, and Rhodes used and carried a sawed-off shotgun during May and June of 1994. As to this count, the evidence was more than sufficient. Carter aided and abetted Rhodes's trade of cocaine for the shotgun by accompanying him to the back of the bar to obtain the drugs for the trade. Alternatively, Carter was liable for Rhodes's offense as a coconspirator.
 
 4. Fair trial
 A. Probable cause to seize Carter's vehicle
 
 43
 Carter claims that there was no probable cause to detain him or to seize his vehicle and that the drugs found in the vehicle were therefore inadmissible. We review a district court's probable cause determination de novo. See Ornelas v. United States, 517 U.S. 690, 691 (1996).
 
 
 44
 On February 10, 1994, Jeffrey Kronenfeld, a New Jersey state trooper, was patrolling Route 80 and noticed a parked vehicle without a front plate and with a dirty back plate. The officer approached the vehicle, where Carter and Yolanda Harrison were resting, and asked for the registration papers. Those papers indicated that the vehicle was a 1983 vehicle and that its owner was a Brian Parks. Kronenfeld believed, however, that the vehicle was probably a 1990 to 1991 model. When he questioned Carter about the vehicle's ownership, Carter responded that it was owned by a man named Brian whose last name he did not know. After Carter and Harrison gave conflicting explanations for their destination, Kronenfeld asked for consent to search. Carter, nervous and agitated, refused. Kronenfeld, believing the car was stolen, called a tow truck to tow the car to the police station.
 
 
 45
 These facts alone constitute probable cause for the brief detention of the vehicle. See Smith v. Ohio, 494 U.S. 541, 542 (1990) (per curiam) (Fourth Amendment permits brief detention of property on basis of only "reasonable, articulable suspicion" that it contains contraband or evidence of criminal activity). Because Kronenfeld did not actually search the vehicle until after he had obtained a warrant, the cocaine subsequently recovered from the vehicle was properly admitted.
 
 
 46
 As to Kronenfeld's alleged improper detention of Carter, we have held that the appropriate remedy in such circumstances is not exclusion of evidence obtained through a subsequent, valid search, but rather a civil suit under Section 1983. See United States v. Ponce, 947 F.2d 646, 651 (2d Cir. 1991) ("We find that the intervening apparently illegal detention of defendants did not taint the subsequent search because the police later obtained a valid search warrant. . . . Our holding is without prejudice to defendants' pursuit of whatever civil claims they may have as a result of their apparently unlawful detention for five hours while the police obtained a search warrant.").
 
 B. Failure to sever
 
 47
 Carter claims that Collins's violent acts were unrelated to his own case and prejudiced the jury against him. Consequently, he argues, the court should either have severed his case from the other defendants or provided a limiting instruction with regard to the arson charge. According to Carter, the court's general and cursory instructions to the jury to consider each defendant separately were insufficient to prevent prejudicial "spillover" with respect to the jury, thereby denying him a fair trial.
 
 
 48
 Carter's claim is reviewable only for plain error because he failed to move for severance prior to trial. Under Fed. R. Crim. P. 8(b), joinder is permitted if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." A "series" exists if there is a logical nexus between the transactions. See United States v. Vasquez-Velasco, 15 F.3d 833, 843 (9th Cir. 1994). Here, the drug and firearm charges were intertwined with the arson charges because the arson was ordered to "eliminate drug competition."
 
 
 49
 Moreover, Carter has failed to "show prejudice so severe that his conviction constituted a miscarriage of justice, and that the denial of his motion constituted an abuse of discretion." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993) (citations omitted); see also United States v. Losada, 674 F.2d 167, 171 (2d Cir. 1982) ("In deciding whether the trial court's [decision not to grant a severance] was correct, a reviewing court should consider the need for judicial economy and the extent to which the judge instructed the jury to consider the evidence separately with respect to each defendant."). Any possibility of prejudicial "spillover" due to the court's refusal to provide a limiting instruction on the arson issue is minimal because the court instructed the jury several times to consider each defendant's guilt separately. See United States v. Alvarado, 882 F.2d 645, 656 (2d Cir. 1989) (holding no reversible error for refusal to sever where "trial judge repeatedly cautioned the jurors to consider the evidence separately with respect to each defendant").
 
 C. Ineffective assistance of counsel
 
 50
 Carter also maintains that his trial counsel rendered ineffective assistance because he failed to conduct an adequate pretrial investigation, failed to call certain witnesses, and deprived Carter of his right to testify. The trial court heard testimony relating to the final issue from Carter and his trial attorney and concluded that Carter made a knowing and voluntary decision not to testify. Given that testimony and the totality of evidence in the record, we see no reason to conclude that the attorney's advice against Carter testifying either fell below professional standards or affected the outcome of the trial. See Strickland v. Washington, 466 U.S. 668, 687 (1984). We will not address Carter's other ineffective assistance claims, because they raise issues that require consideration of extra-record evidence. Carter should therefore pursue them on collateral attack. See Billy-Eko v. United States, 8 F.3d 111 (2d Cir. 1993).
 
 D. Right to jury of peers
 
 51
 Carter argues that his Sixth Amendment right to a jury of his peers was violated as the venire contained only one black out of 500 prospective jurors. Carter has, however, failed to establish a prima facie case because he made absolutely no showing that African Americans were systematically excluded or that the district court's use of voter registration and motor vehicle bureau lists to select the venire results in unfair underrepresentation. See Duren v. Missouri, 439 U.S. 357, 364 (1979) (to establish prima facie violation of Sixth Amendment's cross-section requirement, defendant must show, inter alia, unfair underrepresentation and systematic exclusion); United States v. Rioux, 97 F.3d 648, 655-56 (2d Cir. 1996) (holding that defendant must show unfair underrepresentation by "absolute disparity/absolute numbers" model).
 
 5. Drug quantity calculation at sentencing
 
 52
 Carter also argues that the sentencing court improperly attributed 32 kilograms of cocaine to him. Any such error is harmless, however, because U.S.S.G. 2D1.5 provides that a defendant convicted of a CCE will be assigned the greater of two base offense levels -- either 4 plus the offense level from U.S.S.G. 2D1.1, or 38. Thus, even if the sentencing court erred in its drug quantity determination, and the offense level under Section 2D1.1 was lower than 34, Carter's offense level would still be 38.
 
 C. Carter's pro se claims
 
 53
 We have examined Carter's pro se claims and find them meritless.
 
 
 54
 c) Charles
 
 
 55
 Charles, both through counsel and pro se, also raises various objections to his conviction.
 
 1. Knowledge and conspirator liability
 
 56
 Charles first argues that the district court's response to a jury question failed to explain that knowledge of a crime and failure to report it are alone insufficient to constitute participation in a conspiracy. While we agree that this is a correct statement of the law, see United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997), and that the court did not adequately explain this to the jury, we fail to see any prejudice to Charles.
 
 
 57
 During its deliberations, the jury asked the court: "If a person has firsthand knowledge of a crime that is going to be committed, and does not report it or does nothing to prevent it, does that make him a conspirator of the crime?" Rather than ensure that the jury understood that knowledge and acquiescence are, without more, insufficient as a matter of law to find one guilty of conspiracy, the court told the jury that it was "unable to answer that question," explaining that "that question depends on a lot of things that you may be considering." The court simply instructed the jury to take another "look at the charge." It did not, however, direct the jury to any portion of the charge that would answer its question. Moreover, the jury charge itself does not address the scenario presented by the jury's question: a person with knowledge of the crime who does nothing to prevent it. The conspiracy instruction provided only that a defendant can be a member "without having full knowledge of all the details of the conspiracy," and that a defendant cannot be a member if he "has no knowledge of a conspiracy" but happens to do something that assists the conspiracy. In light of the foregoing, we agree with Charles that the jury may have mistakenly concluded that knowledge of a conspiracy coupled with inaction were sufficient to make a person a conspirator.
 
 
 58
 Nevertheless, any such error was harmless. See Neder v. United States, 119 S. Ct. 1827, 1833-37 (1999) (holding that erroneous jury instruction is subject to harmless error analysis); United States v. Jackson, 196 F.3d 383, 385 (2d Cir. 1999) (affirming convictions where district court's error in failing to instruct jury as to element of charged crime was harmless). The evidence of Charles's participation in Joyner's drug organization is overwhelming. Joyner and 18 former coconspirators testified that Charles participated in Joyner's drug trafficking organization. Murzi, a police informant, testified that he purchased drugs from Charles at Sheion's, and a tape recording of his conversation with Charles was played for the jury. The jury also heard evidence of Charles's guilty plea to a state drug offense that occurred at Sheion's in June 1994. Even if a proper answer had been given to the jury's question, therefore, it is clear beyond a reasonable doubt that the outcome would not have been altered. See Jackson, at 388 (holding erroneous instruction harmless where record showed "beyond a reasonable doubt that a properly instructed jury would nonetheless have found [defendant] guilty").
 
 2. Firearm convictions
 
 59
 Charles next claims that the evidence was insufficient to establish that he used or carried the three firearms Darren Rhodes brought into Sheion's (Counts 46, 47, and 48). We agree.
 
 
 60
 Count 46 alleged that from April 1994 through June 17, 1994, Charles, Joyner, Gillespie, and Rhodes used and carried a .22 Ruger handgun and ammunition. The government claims that Joyner and Rhodes traded cocaine for that firearm and that such a trade was reasonably foreseeable to Charles since Joyner had a policy of trading cocaine for guns in the bars. The government's brief, however, gives the erroneous impression that Rhodes and Joyner acted in concert to trade drugs for the .22 calibre handgun when the evidence shows that Rhodes possessed that and other guns against the express wishes of Joyner and other conspirators, including Charles.
 
 
 61
 Joyner testified that he was in Sheion's one day and saw Rhodes go into the kitchen accompanied by a man carrying a bag. Joyner said he became suspicious and "wanted to know why was Dee Dee [Rhodes] and this person going in the kitchen." Joyner followed them into the kitchen and saw Rhodes "getting coke to buy the gun." When Joyner saw the .22 calibre handgun in the bag, he immediately took it away and "took [the gun] upstairs and put it in the ceiling and forgot all about it." Thus, Rhodes, in buying the gun, acted against Joyner's policy of keeping guns away from him. Joyner also testified that Charles often took guns away from Rhodes as well out of concern that he "was going to end up shooting somebody" because he was always "high" on drugs. Thus, Rhodes's purchase of the handgun in exchange for cocaine was not a "necessary or natural consequence of the unlawful agreement" or in furtherance thereof. Pinkerton v. United States, 328 U.S. 640, 648 (1946). Indeed, Joyner and Charles did exactly what Section 924(c) was designed to induce: "'to persuade the man who is tempted to commit a Federal felony to leave his gun at home.'" United States v. Abreu, 962 F.2d 1447, 1450 (10th Cir. 1992) (en banc) (quoting 114 Cong. Rec. 22231 (daily ed. July 19, 1968) (statement of Rep. Poff)), vacated on other grounds mem., 508 U.S. 935 (1993); see generally United States v. Jordan, 927 F.2d 53, 56 (2d Cir. 1991) ("Pinkerton is not a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit.").
 
 
 62
 Counts 47 and 48 alleged that from February 1994 to June 25, 1994, Charles, Carter, Joyner, Rhodes, and others used and carried a .357 Magnum and a Ruger .22 calibre long rifle semi-automatic handgun. In its brief, the government contends that on June 16, 1994, Joyner directed Charles and Rhodes to remove all the guns and drugs from Sheion's because a police raid on Sheion's was imminent. After the raid, Charles, then in prison, told Rhodes to remove from Sheion's the .357 Magnum and .22 calibre rifle, which the police had overlooked during the raid. According to the government, Rhodes carried the firearms in violation of Section 924(c) when he picked them up at Sheion's, because he took the guns to avoid having them seized by the police and pursuant to Joyner's plan to move his drug operation from Sheion's to Amp's. Charles in turn was liable under Section 924(c) as an aider and abettor or as a coconspirator of Rhodes's carrying of the firearms. The evidence does not support the government's version of events.
 
 
 63
 There is no testimony that Joyner ever told anyone of his plan to move his business to Amp's. Nor is there any evidence that he directed the guns be taken to Amp's. He simply ordered that they be "moved out." Thus, any unspoken intentions by Joyner to move his entire operation to Amp's cannot establish that Charles, who was in prison, acted pursuant to Joyner's unstated plans. Indeed, there was no evidence that Rhodes removed the guns from Sheion's for any purpose other than to keep the police from finding this contraband. Thus, there was no evidence that the removal of the guns was related to or in furtherance of a drug trafficking crime. We therefore vacate Charles's convictions on all three firearm counts.
 
 3. Drug conspiracy
 
 64
 We vacate Charles's drug conspiracy conviction pursuant to Rutledge, 517 U.S. at 300.
 
 4. Ineffective assistance of counsel
 
 65
 Charles claims that his trial counsel provided ineffective assistance in failing to present an alibi defense using a motel receipt, to call certain witnesses, and to introduce a letter written by Joyner to Charles that would have impeached Joyner. All require consideration of extra-record evidence, and Charles should, therefore, first raise these issues on collateral attack. See Billy-Eko, 8 F.3d at 114 (citing United States v. Matos, 905 F.2d 30, 32 (2d Cir. 1990)).
 
 5. Right to remain silent
 
 66
 Charles next argues that Yolanda Turner, a government witness, violated his constitutional right to remain silent by stating in her testimony, "if they was man enough and took the stand and admit what they did, I wouldn't be up here." According to Charles, the prosecutor vouched for or adopted Turner's statement in arguing: "I still say what Yolanda Turner said is right. Life is about responsibility. There are a lot of people in this case who have accepted responsibility. There are six yet who are left who want to avoid that responsibility. And in my view, that's what this case is about. Thank you." Charles maintains that these statements prejudiced the jury into believing he had something to hide by not taking the stand. See Griffin v. California, 380 U.S. 609, 615 (1965).
 
 
 67
 Charles's claim must be reviewed only for plain error because he did not object to the disputed comments at trial. See United States v. Rice, 52 F.3d 843, 845 (10th Cir. 1995). There was no plain error here. The prosecutor did not elicit Turner's isolated comments, and, in light of the copious evidence of Charles's guilt, it is unlikely that Turner's brief remark or the government's summation (even assuming the gloss Charles puts on it) prejudiced the jury.
 
 
 68
 d) Collins
 
 
 69
 We now address Collins's appellate claims.
 
 1. Interstate commerce
 
 70
 Title 18 U.S.C. 844(i) punishes the arson of "any building . . . used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. 844(i). According to Collins, the government failed to prove that Dell's bar "substantially affect[ed]" interstate commerce, as it was required to do under United States v. Lopez, 514 U.S. 549, 558-59 (1995). We disagree.
 
 
 71
 The Supreme Court noted in Russell v. United States that the "reference to 'any building . . . used . . . in any activity affecting interstate or foreign commerce' expresses an intent by Congress to exercise its full power under the Commerce Clause." 471 U.S. 858, 859 (1985) (emphasis added). In United States v. Tocco, 135 F.3d 116 (2d Cir. 1998), we expressly held that "Lopez did not elevate the government's burden in establishing jurisdiction in a federal arson prosecution. . . . Hence, to satisfy 844(i) the government need only prove that the arson in question destroyed or damaged property either 'used in' or 'used in any activity affecting' interstate commerce." Id. at 124. Thus, contrary to Collins's contention, the prohibited conduct in issue need not have had a "substantial" connection to interstate commerce; the "in any activity" language of Section 844(i) requires only evidence that the individual transaction at issue had a de minimis effect on interstate commerce. Collins contends that even under the de minimis standard, the government failed to prove the interstate element. He is mistaken.
 
 
 72
 In Russell, the Supreme Court ruled that an apartment used as rental property "unquestionably" affects interstate commerce under Section 844(i). 471 U.S. at 862. It first noted that "Congress at least intended to protect all business property." Id. (emphasis added). Then, in rejecting the need for direct or specific evidence of the interstate element, the Court stated:
 
 
 73
 We need not rely on the connection between the market for residential units and "the interstate movement of people," to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.
 
 
 74
 Id. Thus, the Court adopted a per se rule that rental property affects interstate commerce under Section 844(i).
 
 
 75
 Russell mandates the adoption of a similar per se rule regarding bars or restaurants. The rationale is identical -- if "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties," id. at 862, then the local operation of a restaurant is merely an element of a much broader commercial market of food and drink delivery. Here, the building torched included a restaurant. Thus, although the government concedes that it failed to introduce any direct evidence at trial to show that Dell's obtained food or beverage from out-of-state sources or catered to interstate patrons, the jury properly concluded that Dell's was part of a broader restaurant market connected to interstate commerce.
 
 2. Double jeopardy
 
 76
 Collins next claims that the government improperly arraigned him on the second superseding indictment after the trial on the first superseding indictment had already commenced. Because jeopardy attaches for purposes of the Double Jeopardy Clause when the jury is empaneled and sworn, see Crist v. Bretz, 437 U.S. 28, 35 (1978), Collins claims that the delayed arraignment violated his constitutional rights. Again, we disagree.
 
 
 77
 In Crist, the trial court had dismissed both the first information and the already-empaneled jury. A second jury was empaneled and sworn after a new information was filed. That second jury convicted the defendants, and they brought a habeas corpus proceeding challenging their convictions on double jeopardy grounds. The Supreme Court held that the convictions were invalid because jeopardy attached when the first jury was empaneled and sworn. It explained that this rule "lies in the need to protect the interest of an accused in retaining a chosen jury" -- i.e., to protect a defendant's "valued right to have his trial completed by a particular tribunal." Id. at 35-36 (quoting Wade v. Hunter, 336 U.S. 684, 689 (1949)). In the instant case, however, the jury was never dismissed. Thus, the failure to arraign Collins on the second superseding indictment prior to the commencement of trial did not impair his right to retain a chosen jury. Moreover, as the Supreme Court held in Garland v. Washington, 232 U.S. 642 (1914), the "want of formal arraignment [on a second information in no way] deprived the accused of any substantial right, or in any wise changed the course of trial to his disadvantage." Id. at 645. "[S]uch strict adherence to the mere formalities of trial" is not required under the Due Process Clause. Id. at 646.
 
 3. Failure to sever
 
 78
 Collins contends that the district court's failure to sever his case constituted an abuse of discretion. Because no motion to sever was made, we review this claim only for plain error. See Fed. R. Crim. P. 52(b); United States v. Quintero, 38 F.3d 1317, 1339 (3d Cir. 1994). Collins correctly notes that the trial focused principally on the long-running narcotics conspiracy. It is also true that only a small portion of the trial related to the arson, even though the trial lasted two months, encompassed almost 6,000 pages of trial transcript, and involved 94 prosecution witnesses. Having been charged only with a single act on a single day, Collins argues that had he been granted a separate trial, none of the mass of narcotics and weapons evidence would have been admissible against him. Moreover, given the limited nature of the proof as to arson, a separate trial of Collins would not have been too burdensome on the government or the court.
 
 
 79
 Collins's claim is overstated. The existence and extent of the Joyner ring and the nature of its principal business -- drug trafficking -- would have been admitted to provide background and motive for the Dell's arson. Any prejudice that might have been added by evidence of the dreary details was surely marginal and could not have risen to the level of a "miscarriage of justice." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam). Morevoer, the evidence against Collins was overwhelming, and the possibility of prejudicial "spillover" was minimal to non-existent as the court instructed the jury to consider each defendant's guilt separately.
 
 4. Ex post facto violation
 
 80
 At the time of Collins's arson, Section 34 of 18 U.S.C. provided that a defendant convicted of arson, which resulted in the death of a person, could be subject to the death penalty or life imprisonment only if the jury so directed. The jury-directive requirement was eliminated in 1994. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. VI, 60003(a)(1), 108 Stat. 1796, 1968 (1994). Relying on the language in United States v. Tocco, 135 F.3d 116 (2d Cir. 1998), Collins asserts that the sentencing court violated his rights under the Ex Post Facto clause of the Constitution by sentencing him to life imprisonment without having submitted that issue to the jury as required under the law in effect at the time the offense was committed. We disagree.
 
 
 81
 To be sure, Tocco stated that a life sentence imposed without a jury directive would amount to an ex post facto violation. That language, however, was dicta. And, Collins v. Youngblood, 497 U.S. 37 (1990), leads us to conclude otherwise. In that case, a newly enacted law permitted an appellate court to reform an improper verdict when previously a defendant would necessarily get a new trial by jury. The Court defined an ex post facto law as one that (1) "punishes as a crime an act previously committed, which was innocent when done," (2) "makes more burdensome the punishment for a crime, after its commission," or (3) "deprives one charged with a crime of any defense available according to law at the time when the act was committed." Collins, 497 U.S. at 42-43 (internal quotations and citations omitted). "The right to a jury trial provided by the Sixth Amendment is obviously a 'substantial' one, but it is not a right that has anything to do with the definition of crimes, defenses, or punishments, which is the concern of the Ex Post Facto Clause." Id. at 51. Similarly, a change in law that reduces or eliminates the jury's role in determining the crime or punishment of a defendant does not violate the Ex Post Facto Clause because it does not change the substantive definition of the crime, increase the punishment, or eliminate any defense with respect to the offense of arson. Indeed, if removing the right to a new trial by jury does not violate the Ex Post Facto Clause, then, a fortiori, removing the right to sentencing by jury passes constitutional muster. See United States v. Grimes, 142 F.3d 1342, 1350-51 (11th Cir. 1998) (holding that application of 1994 amendments to pre-1994 arson does not violate ex post facto principles).
 
 5. Restitution
 
 82
 Finally, Collins maintains that the district court failed to consider the factors mandated by the statute authorizing restitution as part of a sentence, 18 U.S.C. 3664(a), and that the order requiring Collins to pay $1,846,637.45 must be vacated. We review an order of restitution for abuse of discretion. See United States v. Thompson, 113 F.3d 13, 14 (2d Cir. 1997). An improperly ordered restitution, however, constitutes an illegal sentence amounting to plain error. See id.
 
 
 83
 Section 3664(a) requires that before restitution may be ordered, the district court must give adequate consideration to: "the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. 3664(a). "Although the district court need not set forth detailed findings, [we] will vacate a restitution order if the record does not reflect that the court considered these mandatory factors." Thompson, 113 F.3d at 15. Here, the record shows no indication that the sentencing court considered these factors. The government argues that the court considered the factors after imposing restitution, when it explained that it would not impose a fine in light of Collins's financial condition. A determination not to impose a fine, however, is not an adequate substitute for express compliance with Section 3664(a) when ordering restitution in the amount of $1.8 million. Indeed, the seeming inconsistency leaves us with no idea of the district court's view of the balance of the Section 3664(a) factors. See United States v. Kinlock, 174 F.3d 297, 299 (2d Cir. 1999) (noting that "there must be an affirmative act or statement allowing an inference that the district court in fact considered the defendant's ability to pay") (citations omitted). We therefore set aside that portion of the order imposing restitution in the amount of $1,846,637.45 and remand for further consideration.
 
 6. Ineffective assistance of counsel
 
 84
 Collins also argues that he was denied his right to effective assistance of counsel because his trial counsel failed to file a motion for severance, failed to object to the judge's charge on the interstate commerce element, and failed to object to the restitution order. However, as to the severance and interstate commerce issues, we see no omission that could have affected the outcome of the trial. As to the restitution issue, Collins can, as discussed supra, seek relief on remand. The second prong of Strickland, a showing of prejudice, has therefore not been met as to that issue. Strickland v. Washington, 466 U.S. 668, 695-96 (1984).
 
 
 85
 e) Willoghby
 
 
 86
 Willoghby first argues that the district court erred by failing to explain the extent of its downward departure. Such a claim is not cognizable on appeal. United States v. Hargrett, 156 F.3d 447, 449-51 (2d Cir.), cert. denied, 119 S. Ct. 607 (1998); see also United States v. Lawal, 17 F.3d 560, 563 (2d Cir. 1994).
 
 
 87
 Willoghby next claims that the sentencing court erred in determining his base offense level as 26. When Willoghby challenged the PSI's conclusion that he could have reasonably foreseen sales of between 500 grams and two kilos of cocaine, the court stated that Willoghby had accepted that range during an interview with the probation officer. Willoghby denied this. The court then asked the government for input on this issue, but none was forthcoming. Willoghby claims that instead of attempting to resolve this dispute and explain clearly why it credited the probation officer over Willoghby, the court merely accepted the amount arrived at in the PSI and sentenced Willoghby based on an offense level of 26.
 
 
 88
 Contrary to Willoghby's description of events, the court made a specific finding that "anyone even working there in a janitorial capacity would be able to see what was going on. And he has pled guilty to being a member of the conspiracy." The court's finding was not clearly erroneous. Willoghby's plea was based on the fact that he worked at the bar and knew that his coconspirators were selling drugs, as was he. Given that and the evidence concerning drug sales, the amount was reasonably foreseeable. The court's finding was also sufficiently specific to satisfy Fed. R. Crim. P. 32(b)(6)(D).
 
 
 89
 f) Barrett and Sweat
 
 
 90
 Barrett and Sweat raise a number of objections, some of which were raised by other defendants. Specifically, they claim that the indictment mistakenly charged them with aiding and abetting a CCE and that their case should have been severed. We rely on previous discussions of these issues with regard to other defendants in rejecting their claims. We now examine their other claims.
 
 1. Non-disclosure of Brady material
 
 91
 In May 1997, five months after Barrett and Sweat's second trial, Shatima Turner -- the government's key witness at Barrett and Sweat's retrial -- was indicted on federal drug trafficking charges. Barrett and Sweat filed a motion for a new trial on the ground that the government had suppressed the evidence of her 1996 drug crime. The court denied the motion for a new trial, finding that the prosecutor did not know of Turner's drug crime during the retrial and that he disclosed what evidence he had prior to trial. On appeal, Barrett and Sweat again claim that, at the time of their retrial, the government must have known that Turner was the target of an ongoing investigation and that its failure to disclose this information constitutes reversible error. However, we see no such error. The prosecutor's affidavit stated that he did not know of Turner's 1996 drug crime at the time of Barrett and Sweat's retrial, and the court was entitled to credit that affidavit.
 
 2. Perjured testimony
 
 92
 Barrett and Sweat next argue that it must have been evident to the government that Turner perjured herself during the second trial. We disagree. Turner's testimony at the first trial that she did not see Barrett with a gun after Gillespie came to Choice's was not inconsistent with her testimony at the retrial that Barrett had a gun on the date that Gillespie came to the bar. In any event, Turner explained on cross-examination that her failure at the first trial to mention that Barrett had a gun was due to her nervousness at the first trial -- a not implausible explanation. Even if her testimony was perjurious, however, cross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony. See United States v. Blair, 958 F.2d 26, 29 (2d Cir. 1992). Here, Barrett fully cross-examined Turner about her allegedly perjurious statements, and the district court charged the jury on witness credibility, prior inconsistent statements, and on the jury's right to disregard false testimony. Her testimony did not, therefore, taint the trial.
 
 3. Jencks Act
 
 93
 Barrett and Sweat claim that the government violated the Jencks Act, 18 U.S.C. 3500, by failing to turn over in a timely manner grand jury testimony of a government witness. After Barrett's opening statement pro se and very soon after Barrett had started to cross examine a government witness, Investigator Edwin Ramos, the prosecutor found a second transcript of Ramos's grand jury testimony that had not been disclosed to the defense earlier. When he gave Barrett this transcript, Barrett claimed that the tardy disclosure prejudiced his case because it contained evidence that contradicted an assertion he made in his opening statement about the lack of witnesses against him at the Grand Jury and the failure of some even to name him. The court concluded that the Jencks Act had been satisfied and gave Barrett some time to review the transcript before resuming his cross-examination of the witness. At that point, Barrett elected to proceed with counsel.
 
 
 94
 Section 3500(a) of 18 U.S.C. provides that prior statements of a government witness will not be the subject of "discovery [] or inspection until said witness has testified on direct examination in the trial of the case." The government claims that its failure to disclose the second transcript was inadvertent. It also contends that it satisfied the disclosure requirement by providing Barrett with Ramos's grand jury transcript after Ramos's direct examination and before he was subjected to cross-examination. We do not resolve this dispute because, even if there was error, it was harmless. Ramos was a minor witness who merely outlined the government's investigation of the Joyner enterprise. He did not provide substantial incriminating evidence against Barrett, and any contradiction of Barrett's assertion in his opening statement was virtually irrelevant.
 
 4. Double jeopardy
 
 95
 Barrett and Sweat claim that their retrial violated the Double Jeopardy Clause because they made no motion for mistrial and were not given the opportunity to be heard on the issue. The trial court aborted the first trial, they argue, without obtaining their consent and without sufficient inquiry or instructions regarding deliberations. We find no merit in this claim.
 
 
 96
 The Supreme Court noted in Arizona v. Washington, 434 U.S. 497 (1978), that "the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, [has] long [been] considered the classic basis for a proper mistrial." Id. at 509. "[T]he trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial." Id. The trial judge has "broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury . . . . [and his] decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court." Id. at 509-10. In the instant case, the judge's discharge was well within its discretion. The jury was unable to reach a verdict as to Barrett and Sweat after protracted deliberations and in spite of the court's Allen charge. After the court polled the jury, it properly discharged it. See United States v. Leslie, 103 F.3d 1093, 1103 (2d Cir. 1997) (where there has only been mistrial resulting from hung jury and not from judicial finding of insufficiency of evidence, retrial is not barred by Double Jeopardy Clause).
 
 5. Anti-gratuity statute
 
 97
 Finally, Barrett and Sweat argue that the admission of coconspirator testimony at their trial violated the "anti-gratuity statute," 18 U.S.C. 201(c)(2), because the government promised these witnesses leniency in exchange for their truthful testimony. We have already rejected such a claim. SeeUnited States v. Stephenson, 183 F.3d 110 (2d Cir.), cert. denied, 120 S. Ct. 517 (1999).
 
 CONCLUSION
 
 98
 We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.